AARON M. KINIKINI (Bar No. 10225)
NICHOLAS H.K. JACKSON (Bar No. 15079)
NATE CRIPPES (Bar No. 14622)
Disability Law Center
205 North 400 West
Salt Lake City, Utah   84103
Phone:  (801) 363-1347
Fax:  (801) 363-1437
Email:  akinikini@disabilitylawcenter.org
        njackson@disabilitylawcenter.org
        ncrippes@disabilitylawcenter.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CALY WATKINS as legal guardian of K.W. | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| v. | (Jury Demand) |
| JORDAN SCHOOL DISTRICT, Anthony Godfrey in his individual and official capacity as Superintendent of Jordan School District; Jordan School District Board of Education; Bryce Dunford in his official capacity as President of the Jordan School District Board of Education | Case No. 2:19-cv-00407-PMW |
| Defendants. | |

Plaintiff, K.W., by and through counsel, Disability Law Center, complains, states, alleges

and claims as causes of action against defendants as follows:

## PRELIMINARY STATEMENT

1.      This 42 U.S.C. § 1983 action seeks equitable relief from the unlawful policies, practices and actions of defendant JORDAN SCHOOL DISTRICT, as controlled by defendant JORDAN SCHOOL DISTRICT BOARD OF EDUCATION, and enforced and implemented by defendants BRYCE DUNFORD and ANTHONY GODFREY. Plaintiff seeks declaratory judgment, permanent injunctive relief, and damages as well as legal and equitable relief from defendants' policies and actions which have violated and continue to violate plaintiff's rights pursuant to Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 *et seq.* (2002), and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq* (2011).  Plaintiff seeks injunctive relief requiring defendants to correct their violations of plaintiff's rights, prohibiting defendants from continuing their misconduct in violation of the ADA and Rehabilitation Act, and from engaging in similar conduct in the future.  Plaintiff seeks attorney's fees and court costs pursuant to 42 U.S.C. § 12205 (2010) and 29 U.S.C. § 794(a), and under 42 U.S.C. § 1983 and § 1988.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction to hear and decide Plaintiff's ADA and Rehabilitation Act claims pursuant to 42 U.S.C. §12188 (2015),§ 12189 (2008), and 29 U.S.C. § 794(a), as the Plaintiff's claims arise under and are based upon violations of Title II of the ADA, 42 U.S.C. §12182, *et seq*. (2010) and Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

3.      This Court is vested with original jurisdiction of these claims pursuant to 28 U.S.C. §1331 (2011) and §2201 (2015).

4.      This court has jurisdiction to grant declaratory relief in this action pursuant to 28 U.S.C. § 2201.

5.      Venue for this action is proper in the United States District Court for the District of Utah, Central Division pursuant to 28 U.S.C. §§ 125 and §1391(b)-(c) (2015)  because all conduct complained of herein occurred or will occur in Salt Lake County, Utah and in the Central Division of this Court. The subject public entity and services immediately at issue are located in Salt Lake County, Utah.  The defendants to this action reside in and/ or have official duties in the Central Division of the District of Utah.

## PARTIES

1.      Plaintiff K.W. is and was at all times alleged herein a citizen and resident of the State of Utah. K.W. is a qualified person with a disability as defined by the ADA and the Rehabilitation Act.  K.W. is a minor, limiting his ability to protect his legal interests.  His mother and legal guardian, Caly Watkins ("Ms. Watkins"), must therefore represent his interests. All exhibits attached hereto have been redacted to protect K.W's privacy.

2.      Defendant JORDAN SCHOOL DISTRICT ("JSD") is a public school district, providing educational services to children in the State of Utah.  It is a public entity subject to the ADA and a recipient of federal funds subject to the Rehabilitation Act.

3.      Defendant JORDAN SCHOOL DISTRICT BOARD OF EDUCATION ("Jordan School Board") leads and directs the actions, policies, and practices of JSD and consists of seven elected members. The Jordan School Board is, and was at all times material hereto charged with

the supervision, control, and management of all matters relating to the public schools within JSD boundaries. Jordan School Board is a public entity subject to the ADA and a recipient of federal funds subject to the Rehabilitation Act. Jordan School Board is a "body corporate" as defined by Utah statute, and may sue and be sued. U.C.A. § 53G-4-401(4). The Jordan School Board, by and through its President and constituent members, is sued in official capacity for equitable relief only.

4.      Defendant ANTHONY GODFREY ("Godfrey") is presently Superintendent of JSD. He previously served as Associate Superintendent. Mr. Godfrey is being sued in his individual and official capacity as the person who directly enforced the unlawful policies and practices complained of herein. He is being sued for legal and equitable relief.

5.      Defendant BRYCE DUNFORD ("Dunford") is the President of defendant Jordan School Board. He, along with the other members of the Jordan School Board have final discretionary decision making authority concerning policies governing JSD. He is sued in his official capacity for equitable relief only.

6.      At all relevant times, all defendants were, are and will be acting under color of state law, custom and usage, and were and are state actors.

**OPERATIVE FACTS**

7.      K.W. is an 8 year old individual with diabetes, which is a disability as defined by the A.D.A. and the Rehabilitation Act.

8.      K.W. has attended Butterfield, which is part of JSD since he began his education in 2016. He is, in every way, a qualified person with a disability and is able to successfully and

safely attend public school so long as he is allowed access to his diabetes medication and equipment.

9.      In order to manage his diabetes, K.W. uses two different types of insulin.  First, he uses diluted insulin, currently a 20% solution (the exact solution can change depending on his needs), which his parents dilute for him.  In addition, K.W. uses regular insulin, available without prescription, for his lunch dose.

10.     When K.W. was in first grade, defendant JSD's nurses administered his diabetes medication.  His mother, Ms. Watkins, requested that pictures of the prepared syringes be sent to her via text message to ensure the correct dose was being given.

11.     On numerous occasions, JSD nurses did not send a picture of the correct dose, or the picture was blurred, contributing to Ms. Watkins' escalating concerns about JSD nurses administering K.W.'s medication appropriately.

12.     Ms. Watkins' escalating concern regarding JSD nurses providing appropriate dosage is based, in part, on an incident in January 2018 when a JSD nurse sent her a photo via text message of a syringe containing 10 units of the insulin solution rather than the proper dose which is 1 unit. Fortunately, on that occasion, Ms. Watkins immediately called the JSD nurse to make her aware of the dangerous error and a possibly fatal medical emergency was averted. Understandably and inevitably, this near catastrophe is part of the factual backdrop in this case.

13.     In another troubling incident, on April 17, 2018, Ms. Watkins smartphone app-based system was not receiving a reading from K.W.'s blood glucose monitor. To a mother in Ms. Watkins' position, this technology failure was an extremely emergent situation: she had no way of knowing what his readings were or if he was in danger.

14.     Taking immediate action, she rushed to the school, fearful of a worst-case-scenario. In this emergency context, Ms. Watkins did not check-in with the Butterfield front office, as required by their policies.  Instead, she immediately located her son and found that the reason for the tech problems and lack of transmitted readings were a failure on JSD's part to adhere to K.W.'s written 504 plan. Specifically, Butterfield personnel did not allow, or failed to ensure, that K.W. was in possession or in close proximity to his cellphone that connects to his blood glucose monitor via Bluetooth in a room where he had been taken for DIBELS testing.

15.     Ms. Watkins was obviously relieved to find K.W. was safe, but was understandably upset that the 504 plan had been overlooked.

16.     Instead of concern, sympathy or an expression of relief that JSD personnel's failure to implement an active 504 plan, or an apology for the failure, Ms. Watkins was shocked to receive what amounted to an emailed reprimand and scolding from Butterfield's Principal, Amanda Bollinger ("Ms. Bollinger")(*See* "JSD/Ms. Bollinger Email to Ms. Watkins, dated April 18, 2018," Exhibit A, *attached*).

17.     In this email, Ms. Bollinger proceeded to threaten Ms. Watkins with punitive, retaliatory actions including limiting or denying her access to the school and, more intimidating still, disclosing that she had "shared her concerns with our School Resource Officer." *Id.*

18.     To Ms. Watkins, this was an explicit threat to bar her from access to her son for purposes of ensuring his safety, as well as a less-than-veiled threat to involve the Police should she engage in any further advocacy or self-help in ensuring K.W.'s physical safety and the protection of his rights under federal law. In her emailed reply, Ms. Watkins explained that she did indeed understand the need to maintain security, but also pointed out the emergent

circumstances, the need for immediate entry, and the fact that JSD's competent handling of

K.W.'s medical/ disability needs was spotty at best. *Id.*

19.     During the 2017-2018 school year, Ms. Watkins requested that K.W. be allowed

to have his diabetes medication administered by JSD nurses via pre-filled syringes, prepared at

home by K.W.'s parents: this accommodation request was denied, despite being supported by a

letter from Dr. Mary Murray ("Dr. Murray"), K.W.'s endocrinologist, stating her medical

opinion that pre-filled syringes were safe and appropriate for K.W.'s needs at school.

20.     Prior to the 2018-2019 school year, which would be K.W.'s second grade year, an

Individual Health Care Plan ("IHCP") meeting was scheduled for staff at Butterfield and K.W.'s

parents because his current Diabetes Medical Management Orders ("DMMO") was nearing its

expiration, and without a current DMMO, he would not be permitted to attend school.  The IHCP

meeting was scheduled for August 17, 2018.

21.     Based on growing concerns regarding inconsistencies and difficulties with school

nurses' medication management in the 2017-2018 school year, Ms. Watkins again requested that

K.W. be permitted to self-administer his diabetes medication via pre-filled syringes during the

2018-2019 school year. This request was made prior to the IHCP meeting.  JSD did not respond

to this accommodation request prior to the scheduled IHCP meeting, nor was the request

addressed during the meeting.

22.     Following the IHCP meeting, on August 31, 2018, Ms. Watkins received an email

from defendant JSD's employee, Nancy Ward.  The email stated that K.W.'s DMMO expired on

September 5, 2018, and, without an updated DMMO, as well as the receipt of certain parent-

signed, JSD-created form ("Jordan School District Nursing Services Request for Special

Healthcare Services and Release of Confidential Information"), K.W. could not attend Butterfield after that date.  (*See* "JSD/ Nancy Ward letter to Ms. Watkins, dated 8/31/2018" Exhibit B, *attached*).

23.     K.W.'s parents declined to execute the forms because they were not actually requesting JSD's nursing services, rather they were declining such services in favor of K.W.'s self-administration, and they felt the specific JSD medical release was overbroad and unnecessary given that the DMMO was to be approved and prescribed by K.W.'s physician. As an alternative, Ms. Watkins offered to sign some kind of modified and more limited release which would allow JSD staff to consult with K.W.'s physician as needed and with parental participation.

24.     In an email on September 3, 2018, Ms. Watkins made another written request for accommodations under the ADA/Rehabilitation Act.  (*See* "Ms. Watkins email to JSD dated 9/3/2018," Exhibit C, *attached*).  In this written request for accommodation, Ms. Watkins explicitly asked JSD for the following: (1) to allow K.W. to carry and self-administer pre-filled syringes with diluted insulin while at school, which is a statutory right protected under Utah law[1]

---

[1] **Utah Code Ann. 53G-9-506 (West 2018).  Diabetes medication -- Possession -- Self-administration.**

(1) As used in this section, "diabetes medication" means prescription or nonprescription medication used to treat diabetes, including related medical devices, supplies, and equipment used to treat diabetes.

(2) A public school shall permit a student to possess or possess and self-administer diabetes medication if:
   (a) the student's parent signs a statement:
      (i) authorizing the student to possess or possess and self-administer diabetes medication; and
      (ii) acknowledging that the student is responsible for, and capable of, possessing or possessing and self-administering the diabetes medication; and

   (b) the student's health care provider provides a written statement that states:
      (i) it is medically appropriate for the student to possess or possess and self-administer diabetes medication and the student should be in possession of diabetes medication at all times; and

and which was specifically provided for in his DMMO; (2) if JSD refused to permit K.W. to self-administer, then to allow K.W.'s parents admission to Butterfield, as needed, in order to administer K.W.'s medication rather than relying on JSD nursing personnel; and (3) to amend the medical release which JSD persisted in demanding from K.W.'s parents so that it included a provision that JSD personnel could speak with K.W.'s doctor, but only if his parents were involved in the conversation.  *See* Exhibit C.

25.     Under Utah statute ( *supra* n. 1,  at 8), a public school is *required* to permit a student to possess and self-administer diabetes medication if: 1) the student's guardian provides a signed statement authorizing the student to possess and self-administer, while also attesting to the student's responsibility for and capability to possess and self-administer the needed medication; and 2) if the student's medical provider also provides a written statement identifying the prescribed medication and attesting that it is medically appropriate for the student to possess and self-administer the diabetes medication. Utah Code Ann. § 53G-9-506(2) (West 2018).

26.     "Diabetes medication" is defined as "prescription or nonprescription medication used to treat diabetes, including related medical devices, supplies, and equipment used to treat diabetes.  *Id.* at § 53G-9-506(1).

27.     On September 4, 2018, Ms. Watkins received a response from JSD Superintendent, defendant Anthony Godfrey, denying her accommodation request that K.W. be

---

(ii) the name of the diabetes medication prescribed or authorized for the student's use.

(3) The Utah Department of Health, in cooperation with the state superintendent, shall design forms to be used by public schools for the parental and health care provider statements described in Subsection (2).

(4) Section 53G-8-205 does not apply to the possession and self-administration of diabetes medication in accordance with this section.

permitted to carry and self-administer insulin using pre-filled syringes. (*See* "JSD/ Anthony Godfrey email/letter to Ms. Watkins, dated 8/31/2018" <u>Exhibit D</u>, *attached*).

28.     The reasons defendant Godfrey cited for the denial of the accommodation are: (1) K.W. already has an accommodation, pursuant to his 504 plan under the Rehabilitation Act, which is a 1:1 nurse, (2) he would already be permitted to carry an "insulin pen," which is essentially a pre-filled syringe designed by a manufacturer, (3) the U.S. Food and Drug Administration, as well as a syringe manufacturer, recommend not using pre-filled syringes, and (4) because the syringes would not be filled by a manufacturer and are not recommended by the FDA/syringe manufacturer, JSD believed they would be unsafe for K.W. and other students.  *See* <u>Exhibit D</u>.

29.     On information and belief, there is no manufacturer which makes or offers for sale an insulin pen that is filled with diluted insulin, the specific diabetes medication that K.W. requires.

30.     On information and belief, in her discussions with defendant JSD about the requested accommodation, Ms. Watkins explained that the pre-filled syringes that K.W. be permitted to possess would be stored in a backpack separate from his usual backpack, and which would be clearly labeled as "Medical Equipment."  The syringes would be inside of another smaller zipped bag inside of the Medical Equipment backpack.  The syringes, behind two zippers, would have a cap over the tip and over the plunger.  Moreover, due to a sensor K.W. wears to detect his blood sugar, which his mother can also see via smartphone app, he would never be more than 20 feet from this bag, mitigating any risk that it would ever stray beyond K.W.'s immediate sight and control.

31.     On September 11, 2018, due to the ongoing disagreement regarding K.W.'s diabetes medication management, JSD decided to place K.W. on home hospital status, a form of restrictive and segregated education placement intended for children who are too ill at home or in a hospital, and who cannot attend school.

32.     At no time relevant to this action has K.W. been too ill or hospitalized or otherwise physically unable to attend school at Butterfield.

33.     On September 12, 2018, Ms. Watkins provided JSD with an updated DMMO written by his endocrinologist, Dr. Murray (*See* "September 2018 DMMO," Exhibit E, *attached*.).  This DMMO was unsigned, as Dr. Murray preferred that JSD and the Watkins to come to an agreement regarding specific logistical details before signing and finalizing.

34.     Between September 13 and September 26 of 2018 Ms. Watkins attempted at least six times to secure JSD's approval of the specifics needed in the DMMO.  She received no response, nor did JSD take any action to engage in any process of finding any alternative appropriate accommodation for K.W. which would facilitate a finalized DMMO.

35.     On September 14, 2018, Ms. Watkins began to consult with and later retained the Disability Law Center ("DLC"), now counsel for K.W.

36.     Over the next six months, the DLC and counsel for JSD attempted to resolve the DMMO issues, all while K.W. was denied access to his school and was receiving his education via home hospital placement.

37.     Most notably, on December 21, 2018, counsel for JSD sent a letter to the DLC regarding K.W.  In this letter, JSD represented that it was now willing to consider allowing pre-filled syringes, but requested some specific language be inserted into the DMMO.  In addition,

JSD would require that any pre-filled syringe be filled with pharmacy-diluted insulin and that each syringe be labeled by the pharmacy.  (*See* "Letter from JSD counsel, dated 12/21/2018," Exhibit F, *attached*).

38.     On January 30, 2019, JSD, through counsel, was provided an updated DMMO, fully completed and signed by Dr. Murray, which included the language JSD had requested. (*See* "January 2019 DMMO)," Exhibit G, *attached*).  This latest iteration of the DMMO read, in part, "[K.W.] has a diagnosis of diabetes mellitus and it is 'medically appropriate for the student to possess and self-administer diabetes medication and the student should be in possession of diabetes medications at all times' (Utah Code 53G-9-506)."  In addition, per Dr. Murray's assessment, "[K.W.] is capable to carbohydrate count meals and snacks for insulin adjustment, carry, and self-administer diabetes medication (*prefilled insulin syringes*)."  Exhibit G, *emphasis* added.

39.     For the section on "Insulin Administration" in the January 29th DMMO, Dr. Murray lists "Insulin Type" as "Diluted Novolog (2:10 dilution, prefilled syringe) Novolin R (Regular, prefilled syringe)."  Further, both the lunch dose and correction dose sections also include the same, that K.W. will administer those via pre-filled syringe.  *Id*.

40.     K.W.'s parents have home-diluted his insulin since his diabetes treatment has required it.  It is a simple procedure that, for his current solution, requires his parents drawing out 200 units from a 1000 unit bottle non-prescription diluent, drawing out 200 units of Novolog from a vial, and then injecting the Novolog into the diluent bottle. It is a convenient, affordable, and medically sound approach for K.W.'s diabetes management, approved of by his treating physician.

41.     In contrast, on information and belief, Pharmacy-dilution, would require K.W.'s parents to drive many miles to the one pharmacy that will provide such service, and would also require them to pay several hundred dollars out of pocket on a regular basis for a completely unnecessary service that is neither contemplated nor covered by insurance.

42.     In addition, on information and belief, the pharmacy in question has been unwilling to pre-fill and label each individual syringe—as such a service is peculiar and well outside the bounds of typical pharmacy services.  Consequently, K.W.'s parents would still have to fill and label the syringes.  Moreover, K.W.'s lunch dose requires regular insulin, which is over-the-counter and as such, would not be labelled by a pharmacy. These facts rendered JSD's evolving list of conditions completely impracticable.

43.     Over the course of the entirety of the 2018-2019 school year, K.W. has requested numerous times, via his parents and through counsel, in writing and in meetings, that JSD modify its policies to allow him to carry and self-administer syringes that are pre-filled with home-diluted insulin to manage his diabetes.  K.W.'s doctors have signed off on this diabetes management, as have his parents, in accordance with Utah law.  Defendants have denied all of these many requests for reasonable accommodation and have been in continuous violation of Utah Code § 53G-9-506, by refusing to allow K.W. to possess and self-administer his diabetes medication.

44.     Due to defendants' ongoing refusals to accommodate K.W.'s disability and medical needs, he has been denied his right to attend school with his non-diabetic peers for an entire school year.

45.     As a result of defendants' conduct and policies, K.W. and his family have all

suffered damages, including, but not limited to, loss of educational opportunity and severe

emotional distress and psychological injury.

46.     Unless and until defendants relent and comply with Utah law and federal

disability statutes by granting the requested accommodation, K.W. will not be permitted to attend

Butterfield for the upcoming 2019-2020 school year.


**CAUSES OF ACTION**

47.     Plaintiff, K.W. repeats and re-alleges each and every allegation contained in the

foregoing paragraphs and incorporates the same herein by reference.

48.     K.W. brings this action under Title II of the ADA, 42 U.S.C. §12131, *et seq.*

(2002); and the Rehabilitation Act 29 U.S.C. § 794, *et seq* (2011).

49.     "[A]ny department agency, special purpose district, or other instrumentality of a

State or States or local government" are Public Entities under the ADA.  *Id.* at § 12131(1)(B).

50.     Under the Rehabilitation Act, "a local education agency" is a covered "program

or activity," if they receive Federal funds.  29 U.S.C. § 794(b)(2)(B).

51.     Title II of the ADA prohibits, *inter alia*, discrimination on the basis of disability

by any public entity.  *See* 42 U.S.C. § 12132 (2010).  Public entities, in order to avoid

discrimination, must "make reasonable modifications in policies, practices, or procedures, when

the modifications are necessary to avoid discrimination on the basis of disability, unless the

public entity can demonstrate that making the modifications would fundamentally alter the

nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i) (2008).  In addition,

"[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." *Id.* at § 35.130(a). Finally, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* at §35.130(d).

52.     The Rehabilitation Act prohibits discrimination on the basis of disability by any covered program or activity receiving financial assistance from the Federal government. 29 U.S.C. § 794(a). Discrimination under the Rehabilitation Act includes a covered entity, in providing an "aid, benefit, or service," denying a qualified individual with a disability "the opportunity to participate in or benefit from the aid, benefit or service." 34 C.F.R. § 104.4(b)(1)(i) (2012). Covered entities also must not provide those aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others. *Id.* at §§ 104.4(b)(1)(ii)-(iii).

53.     As described, *supra*, defendants denied K.W. access to their services solely on the basis of his disability. Defendants have also failed to modify their policies and procedures to avoid this discrimination against K.W. Any educational services being provided to K.W. are not equal to or as effective as that provided to others, and he is not being served in the most integrated setting appropriate.

54.     Under the ADA, no person is permitted to discriminate against an individual because they assert their rights under the ADA, nor can any person coerce, intimidate, threaten, or interfere with any individual to exercise or enjoy their rights under the ADA. 42 U.S.C. § 12203(a)-(b).

55.     As described, *supra*, defendants involved their School Resource Officer, law enforcement, merely because Ms. Watkins asserted K.W.'s rights under the ADA/Rehab Act.

56.     Under the ADA, defendants are not required "to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others."  28 C.F.R. § 35.139(a) (2016).

57.     However, in making that determination, defendants "must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probably that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."  *Id.* at § 35.139(b).

58.     Further, "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities.  However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  *Id.* at § 35.130(h) (2008).

59.     Defendants do not have any information tending to support their conclusion that K.W. is a direct threat or safety risk.  Nor did defendants complete an objective, individualized assessment weighing the risks of allowing K.W. to possess and use pre-filled syringes as part of his diabetes management.  Instead, defendants relied on generalizations and speculation about the danger of syringes in general.

60.     Because defendants refused to modify their policies for K.W. and denied him full

and equal access to its school based solely on his disability, they has violated Title II of the ADA

and the Rehabilitation Act.

61.     K.W., despite his diabetes, is completely able to attend defendants' schools and

programs safely.  Defendants' denial of access and failure to accommodate, solely on the basis of

K.W.'s diabetes, constitutes intentional disability-based discrimination.

62.     Defendants' conduct, described above, was intentional and taken in reckless

disregard of the rights afforded K.W. under the ADA and Rehabilitation Act.

### Count I

**(Failure to Modify Policies, Practices, or Procedures in Violation of the ADA)**

63.     Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the

foregoing paragraphs and incorporates the same herein by reference, and further alleges as

follows:

64.     Pursuant to Title II of the ADA, defendants are prohibited from failing to make

reasonable modifications to policies, practices, or procedures when such are necessary to avoid

discrimination, unless such criteria can be shown to "fundamentally alter the nature of the

service, program, or activity.  28 C.F.R. § 35.130(b)(7)(i).

65.     Defendants' refusal to modify their policies, practices, or procedures prevents

K.W. from accessing their educational services.  The requested modifications by K.W., if

granted, would not constitute a fundamental alteration of those services, as evidenced by Utah

State Code Ann. §53G-9-506 (West 2018), which explicitly and unequivocally codifies the

requirement that defendants permit exactly what K.W. was requesting.  Defendants' actions

result in discrimination based on K.W.'s disabilities, in violation of Title II of the ADA and implementing regulations.

## Count II

### (Denial of Access in Violation of the ADA)

66.    Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

67.    Title II of the ADA prohibits public entities, such as JSD and other defendants, from discriminating against a person with a disability because of his disability by denying him the opportunity to participate in or benefit from the services, programs, or activities of the entity. 42 U.S.C. § 12132 (2010).

68.    Defendants' refusal to allow K.W. to access to their school because of his diabetic needs discriminates against him by denying him the opportunity to participate in and benefit from the educational services defendants offer, in violation of the ADA and implementing regulations.

## Count III

### (Failure to Provide Services in the Most Integrated Setting Appropriate to K.W.'s Needs in

**Violation of the ADA)**

69.     Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

70.     As a public entity under Title II of the ADA, JSD and other defendants must administer their services "in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (2008).

71.     Defendants' insistence that K.W. not attend school, but receive an education at home, because of their denial of his requested modification is a failure to administer services to him, a qualified individual with a disability, in an integrated setting and/ or in the most integrated setting appropriate to his needs, in violation of Title II of the ADA and implementing regulations.

## Count IV

**(Retaliation in violation of the ADA)**

72.     Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

73.     It is unlawful for a public entity or any person to retaliate against any person who asserts their own or another's rights under the ADA, or who opposes any violation of such rights under the ADA.  42. U.S.C. § 12203(a).

74.     By threatening to limit Ms. Watkins access to the school and by threatening to involve the Police, Defendants retaliated against Ms. Watkins for her ADA-protected attempts to ensure K.W. was safe and receiving appropriate accommodations.

## Count V

### (Interference, Coercion & Intimidation in Violation of the ADA)

75.     Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

76.     It is unlawful for a public entity or any person to coerce, threaten, intimidate, or interfere with any person in the exercise or enjoyment of their rights under the ADA.  42 U.S.C. § 12203(b).

77.     By threatening to limit Ms. Watkins' access to the school, and by threatening  to involve law enforcement in response to her advocacy on behalf of K.W., defendants engaged in intimidation, and coercion in an attempt to intimidate Ms. Watkins from protecting K.W.'s rights under the ADA.

## Count VI

### (Denial of Participation in Education Services in Violation of the Rehabilitation Act)

78.     Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

79.     Under the Rehabilitation Act, a recipient of Federal financial assistance must not deny a qualified individual "the opportunity to participate in or benefit from the aid, benefit or service" they provide.  34 C.F.R. § 104.4(b)(1)(i) (2012).

80.     Defendants have refused K.W. the opportunity to participate in, and to fully and equally benefit from, its in-school educational services by denying him physical access to Butterfield Elementary School solely on the basis of his disability in violation of the Rehabilitation Act and implementing regulations.

## Count VII

**(Providing Unequal and Less Effective Educational Services in Violation of the Rehabilitation Act)**

81.     Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

82.     The Rehabilitation Act prohibits a covered entity from providing aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others.  *Id.* at §§ 104.4(b)(1)(ii)-(iii).

83.     Because of his disability, defendants have required K.W. to receive educational services in a segregated, restrictive, and completely isolated setting, as compared to the services provided to K.W.'s non-disabled peers. These services are inherently unequal to and obviously inferior to and less effective than those provided to other students without disabilities, which violates the Rehabilitation Act and implementing regulations.

<u>**Count VIII**</u>

**(42 U.S.C. § 1983—deprivation of civil rights by defendants acting under color of law)**

84.    Plaintiff, K.W., repeats and re-alleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

85.    K.W. is a qualified person with a disability and is entitled to the protections afforded by the ADA and Rehabilitation Act as described herein.

86.    Under color of state law, defendants by their conduct herein alleged, willfully and without justification discriminated against K.W. on the basis of his disability and have deprived K.W. of his right to reasonable accommodation and full benefits of a public program as afforded by the ADA and Rehabilitation Act, in violation of 42 U.S.C. § 1983.

87.    As a result of these deprivations of his rights under federal law, K.W. has suffered anxiety and other distress by being removed from an integrated educational setting and denied social interaction with his peers for an entire school year.

88.    By virtue of their foregoing conduct, defendants have violated 42 U.S.C. § 1983 and K.W. is entitled such relief as the Court finds to be appropriate, including, but not limited to, declaratory relief, injunctive relief, compensatory damages, punitive damages, and the costs and expenses of this action.

**DECLARATORY RELIEF**

89.    This action seeks declaratory relief pursuant to 28 U.S.C. § 2201 (2011) for the purpose of determining a question of actual controversy between plaintiff and defendants.

90.     Plaintiff, K.W., is entitled to a declaratory judgment concerning each of defendants' violations of the ADA and implementing regulations, as well as their violations of the Rehabilitation Act and implementing regulation, and specifying K.W.'s rights with regard to defendants' services and facilities.

## INJUNCTIVE RELIEF

91.     This action seeks injunctive relief pursuant to 42 U.S.C. § 12188 and Rule 65 of the Federal Rules of Civil Procedure.

92.     Plaintiff, K.W., is entitled to a permanent injunction requiring defendants' to correct each of their violations of the ADA, Rehabilitation Act, and their implementing regulations as such relate to K.W., and should also be enjoined from any further discriminatory exclusion of K.W. from their school system and services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff K.W. requests that the Court:

1. Exercise jurisdiction over this action;

2. Enter a declaratory judgment on behalf of K.W., declaring that defendants' actions are in violation of Title II of the ADA, Section 504 of the Rehabilitation Act, and their implementing regulations; as well as a judgment that defendants actions are in violation of 42 U.S.C. § 1983.

3. Enter a permanent mandatory injunction ordering defendants to cease their exclusion of K.W. from their public schools, ordering defendants to grant K.W.'s requested modification

and to accommodate K.W.'s disability, and ordering defendants to cease their exclusion of K.W. and other disabled persons from participation or benefits of services and activities when the exclusion or denial occurs by reason of such disability;

4. General and special damages against defendant Godfrey, as to be determined by the Court, but at least nominal in amount;

5. Award to K.W. all costs and attorney's fees expended herein and assess all such costs against defendants;

6. Grant K.W. such other and further relief as may be deemed just, equitable and appropriate by the Court.


RESPECTFULLY SUBMITTED THIS THE 17th DAY OF JULY, 2019.

DISABILITY LAW CENTER

Attorneys for Plaintiff


By /s/ Aaron M Kinikini
    AARON M. KINIKINI
    NICHOLAS H.K. JACKSON
    NATE CRIPPESf